# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

## ELECTRONICALLY FILED

IN RE:

RW LOUISVILLE HOTEL ASSOCIATES, LLC                    CHAPTER 11

DEBTOR IN POSSESSION                    CASE NO. 10-35356

## DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION
## OF RW LOUISVILLE HOTEL ASSOCIATES, LLC

STOLL KEENON OGDEN PLLC

/s/ Lea Pauley Goff
James S. Goldberg
    Email: james.goldberg@skofirm.com
Lea Pauley Goff
    Email: lea.goff@skofirm.com
Emily L. Pagorski
    Email: emily.pagorski@skofirm.com
J. Kent Durning
    Email: kent.durning@skofirm.com
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky  40202
Tel.    (502) 333-6000
Fax    (502) 333-6099


Counsel for the Debtor and Debtor in
Possession, RW Louisville Hotel Associates,
LLC

Dated: March 7, 2011

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1
    A.    Purpose of Disclosure Statement ................................................................1
    B.    Notices of Qualifications for All Parties....................................................1

II. GENERAL INFORMATION ABOUT THE DEBTOR.......................................3
    A.    The Debtor's Hotel, Conference Center and Banquet Business ...............3
    B.    Management and Operations .......................................................................4
    C.    Employees and Employee Benefits ............................................................4
    D.    Pre-Petition Financing ...............................................................................4
    E.    Factors and Events Leading to the Chapter 11 Bankruptcy.......................4
    F.    The Foreclosure Action..............................................................................5

III. SIGNIFICANT CHAPTER 11 EVENTS ...........................................................6
    A.    Payment of Pre-Petition Employee Wages ...............................................6
    B.    Agreement Regarding Use of Cash Collateral...........................................6
    C.    The Debtor's Retention of Counsel ...........................................................7
    D.    Allowance of Sysco's Administrative Claim..............................................7
    E.    Negotiations for a Consensual Plan ..........................................................7

IV. THE PLAN .........................................................................................................8

V. CONFIRMATION OF THE PLAN......................................................................8
    A.    Acceptance or Rejection of the Plan ..........................................................8
            1. Section 1129(a) Requirements................................................................8
            2. Acceptance by an Impaired Class ..........................................................8
            3. Nonconsenual Confirmation..................................................................8
    B.    Conditions Precedent to the Confirmation and Effective Date of the Plan ............8
    C.    Waiver of Conditions Precedent ................................................................8

VI. DEBTOR'S RECOMMENDATION ..................................................................9

VII. PLAN FEASIBILITY AND LIQUIDATION ANALYSIS................................9
    A.    Plan Feasibility For Reorganization...........................................................9
            1. In General...............................................................................................9
            2. Estimated Post-Petition Income.............................................................9
            3. Estimated Post-Petition Expense .........................................................10
            4. Estimated Plan Obligations..................................................................11
    B.    Liquidation Analysis ................................................................................12
            1. Introduction..........................................................................................12
            2. Qualifications and Warnings................................................................12
            3. Assumptions.........................................................................................13
                 (a) Conversion.......................................................................13
                (b) Chapter 7 Trustee's Professionals ...................................13
                (c) Cash in Chapter 7 Liquidation.........................................13

(d) Wind-Down Expenses........................................................................................13
(e) Trustee's Fees and Commissions.....................................................................13
4. Comparison.............................................................................................................13
(a) Chapter 7.......................................................................................................13
(b) Chapter 11.....................................................................................................14

VIII.  VOTING PROCEDURES .................................................................................................15
A.      Notice .................................................................................................................15
B.      General Voting Provisions and Information ........................................................15
1. The Voting Agent ...............................................................................................15
2. Entities Entitled to Vote ....................................................................................15
3. Classes Entitled to Vote ....................................................................................15
4. Vote Required for Acceptance of the Plan .......................................................15
5. Disregarded Votes.............................................................................................15
6. Questions About Voting .....................................................................................16
C.      Voting Procedures...............................................................................................16
1. Voting Deadline .................................................................................................16
2. Ballots ...............................................................................................................16
3. Change or Withdrawal of Vote ..........................................................................16

IX. EFFECT OF CONFIRMATION ..........................................................................................17
A.      Discharge of Claims and Termination of Interests ............................................17
B.      Termination of Subordination Rights and Settlement of Related Claims.............17
C.      Injunction ............................................................................................................17
D.      Terms of Existing Injunctions or Stays...............................................................18
E.      Exculpation .........................................................................................................18

X. FEDERAL TAX CONSEQUENCES UPON CONSUMMATION OF THE PLAN .........18
A.      Consequences to the Debtor ..............................................................................18
B.      Consequences to the Holders of Claims ............................................................19
C.      Disclaimer ...........................................................................................................19

XI. CONCLUSION.....................................................................................................................19

## EXHIBITS

Plan of Reorganization of RW Louisville Hotel Associates, Inc.
Pursuant To Chapter 11 Of The United States Bankruptcy Code ...........................................Exhibit 1

Form Ballots for Classes 1, 2, 3, 4 and 6 ..............................................................................Exhibit 2

# I. INTRODUCTION

A.      Purpose of Disclosure Statement

        RW Louisville Hotel Associates, LLC (the "Debtor") presents this Disclosure Statement to all known Creditors and interested parties to relay information that it deems important for Holders of Allowed Claims to be reasonably informed so that they may ultimately cast a ballot to accept or reject the Plan.[1]  The Disclosure Statement is designed to help Creditors make an informed decision about the benefit of the Plan; however, the Disclosure Statement is only a synopsis of the Plan.  YOU MUST READ THE PLAN TO UNDERSTAND HOW YOUR PARTICULAR RIGHTS WILL BE AFFECTED.  To the extent that the Disclosure Statement differs from the Plan, THE PROVISIONS IN THE PLAN CONTROL OVER ANY STATEMENT CONTAINED HEREIN.

B.      Notices and Qualifications for All Parties

        THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN.  THE DEBTOR MAY NOT SOLICIT ACCEPTANCES OR REJECTIONS UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.

        THE DEBTOR PROVIDED THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ITS PLAN TO HOLDERS OF CLAIMS FOR PURPOSES OF ULTIMATELY SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

        THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN, AND ANY EXHIBITS ATTACHED HERETO IS HIGHLY SPECULATIVE, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS.

        THE DEBTOR ASSERTS THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.   RATHER, HOLDERS OF CLAIMS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.  WITHOUT

---

[1]      All capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings given to them in the Plan of Reorganization of RW Louisville Hotel Associates, LLC pursuant to Chapter 11 of the United States Bankruptcy Code, filed contemporaneously with this document, or by the Bankruptcy Code.

LIMITATION, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

THE DEBTOR MADE THE STATEMENTS AND PROVIDED THE UNAUDITED FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF EXCEPT WHERE INDICATED OTHERWISE. THIS INFORMATION MAY CHANGE. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. PARTIES ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY PERSON OR ENTITY TO DISCLOSE ANY INFORMATION ABOUT OR CONCERNING THE PLAN BEYOND WHAT IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO CONFIRM THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, CERTAIN DOCUMENTS RELATED TO THE PLAN, AND OTHER INFORMATION. THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE; HOWEVER, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF AN EVENT OR EVERY FACT. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN INFORMATION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. EACH CREDITOR AND PARTY IN INTEREST SHOULD CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ANY INFORMATION INCORPORATED THEREIN.

THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR THE COMPLETENESS AND ACCURACY OF ANY INFORMATION CONTAINED THEREIN.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT 1 AND INCORPORATED HERE BY REFERENCE.

## II. GENERAL INFORMATION ABOUT THE DEBTOR

A.    The Debtor's Hotel, Conference Center and Banquet Business

The Debtor owns and operates a Holiday Inn Hotel and Conference Center (the "Holiday Inn Hurstbourne" or "Hotel"), located at 1325 South Hurstbourne Parkway, Louisville, Kentucky 40222 (the "Real Property"). The Debtor is an independent franchisee of Holiday Hospitality Franchising, Inc., also known as InterContinental Hotels Group, and operates the Hotel under a Franchise Agreement. The Debtor owns the Real Property on which the Hotel is located.

The Holiday Inn Hurstbourne is located near the intersection of Hurstbourne Parkway and Interstate 64. The Hotel has operated under the present or prior ownership, at this location, since the 1960's. Its location -- just minutes away from downtown Louisville and the Louisville International Airport -- provides a strategic advantage in the Louisville hotel market. The Hotel offers 271 spacious and luxurious guest rooms and amenities including free parking, wireless internet connection, room service, a full service restaurant and lounge -- the Winner's Circle -- with breakfast, lunch and dinner menus, an extensive fitness center, Jacuzzi, sauna and an indoor pool and sundeck.

A significant portion of the Debtor's business relates to its conference and banquet facilities -- typically 30% of its gross revenues. The Hotel has 20,000 square feet in conference room space and a 6,700 square foot ballroom. It routinely hosts seminars, conventions, meetings, banquets and receptions of all sizes which are

coordinated and managed through its Conference Center. More than 80% of groups hosting events at the Holiday Inn Hurstbourne return within two years, including monthly meetings for UPS, GE, National City Bank (now PNC), PSA, Kroger, EKU/Child Welfare, Extendicare and others.

B.     Management and Operations

The Debtor has owned and operated the Hotel for over five years. Its current manager, James J. Papovich ("Mr. Papovich"), controls the Debtor's operations and assets. Mr. Papovich has over 32 years' experience in the hospitality industry, including extensive experience in the management and operation of full service hotels with conference and banquet facilities. Mr. Papovich has been involved with the management of the Holiday Inn Hurstbourne since 1997, before its acquisition by the Debtor in 2006.

Mr. Papovich has detailed knowledge and experience with the Hotel's business and financial affairs, and he is frequently hired by hotels with conference and banquet facilities outside of the Louisville market as a consultant to recommend improvements and business plans that will lead to increased profitability.

C.     Employees and Employee Benefits

As of the Petition Date, the Debtor employed approximately 110 other full time and part time employees including housekeepers, valets, reservation/desk clerks, chefs, wait staff and a maintenance and ground crew. As part of its ordinary course of business, the Debtor offers health, dental and life insurance benefits to certain of its employees. Approximately 34 employees and their family members have health or dental insurance from Holiday Inn Hurstbourne. The Debtor does not have a pension plan. However, it does offer a 401(k) program for its employees.

D.     Pre-Petition Financing

The Debtor's predecessor acquired the Hotel in May 1998, with a loan, the current holder of which is Wells Fargo Bank, National Association, formerly known as Wells Fargo Bank Minnesota, National Association, successor by Merger to Norwest Bank Minnesota, National Association, as Trustee for the Registered Holders of DLJ Commercial Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 1998-CF2 (the "Noteholder" or "Lender"). The Noteholder acts by and through ORIX Capital Markets, LLC, in its capacity as Special Servicer. The Loan was in the original principal sum of $18,500,000, and is secured by a mortgage agreement creating first-priority liens on the Hotel and the Debtor's personal property. At the time the Loan was made, the Debtor also pledged its rents as further security for the Loan.

E.     Factors and Events Leading to the Chapter 11 Bankruptcy

The Debtor's Chapter 11 Bankruptcy in 2010 was caused by intense downward economic pressure from the recession -- widely believed to be the worst downturn since the Great Depression in the 1930s. Since 1998, while the economy experienced normal

ups and downs, the Debtor and its predecessor operated the Hotel profitably, and serviced the Loan for over eleven years, reducing principal by over $4 million. However, the severe downturn in 2008 caused the Debtor to be unable, by 2009, to meet its obligations on their pre-recession terms. Although businesses of all types have been damaged by this downturn, hotels have particularly struggled. Decreased occupancy rates coupled with a need to slash prices and offer incentives to bring in guests have caused many hotels to experience financial difficulties.[2]

The Debtor was able to weather the economic crisis better than most hotel operators in the area, due in large part to the revenues generated by its conference and banquet facilities. Although the Hotel experienced an almost 7% decrease in room occupancy from 2008 to 2009, it was still able meet its expenses based on conference facility revenue. However, in 2009, bookings for events to be hosted at the conference and banquet facilities began to decline as many businesses and individuals cut event budgets, and the Hotel's income dropped substantially. The Debtor's 2009 operating income dropped by $1.1 million -- more than 20% -- from its 2008 numbers. As of September 30, 2010, the Debtor's gross operating income had decreased even further compared to the same period in 2009, due in large part to reduced occupancy rates.

In an effort to stabilize its financial outlook, the Debtor has implemented cost saving measures such as strict control of payroll, evaluation of all energy consumption, increased negotiation with vendors, reduced print advertising (email and computer blasts now predominating), changes to menus to reduce food costs, usage of in-house labor for certain renovation projects, deferral of employee raises for over two years and renegotiations of the terms of health care and 401K programs, among other things. In May 2010, the Debtor also obtained from the Property Value Administration a downward adjustment in its tax assessment to reflect more accurately the Real Property's market value, resulting in significant property tax savings.

Despite these efforts, due to declining room occupancy rates, decreased room rental fees and a decline in conference center events, the Debtor was unable to satisfy all of its obligations, in particular the mortgage debt that it had been able to satisfy prior to the economic downturn.

Since the Petition Date, the Debtor's revenue has stabilized and it performed better during the winter of 2010/2011 than the same period a year earlier.

F.     The Foreclosure Action

On September 29, 2010, the Lender filed an action in the Jefferson Circuit Court styled, *Wells Fargo Bank, National Association, as Trustee for the Registered Holders of DLJ Commercial Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 1998-CF2, Acting By and Through ORIX Capital Markets, LLC, Solely in its*

---

[2]     For example, the former Marriott East, located on Embassy Square, was unable to survive the economic downturn. Public records reflect that this facility was sold by the lender recently for approximately $4 million -- a price substantially below its appraised value and millions below the amount of secured claims encumbering that property.

*Capacity as Special Servicer v. RW Louisville Hotel Associates, et al.*, Case No. 10-CI-403823, seeking to foreclose on its mortgage on the Real Property and requesting the appointment of a receiver (the "Foreclosure Action"). These proceedings were stayed by the Petition and Order for Relief.

## III. SIGNIFICANT CHAPTER 11 EVENTS

Since the Petition Date, the Debtor has operated as a debtor in possession under the supervision of the Bankruptcy Court. This section contains brief summaries of key events that have occurred during this Chapter 11 Case but it is not a complete overview of all relevant events in this bankruptcy.

### A.    Payment of Pre-Petition Employee Wages

Among its first-day motions, the Debtor filed an Emergency Motion For Order Authorizing Payment Of Pre-Petition Accrued Employee Wages, Salaries, 1099 Income, Taxes, And Benefits (the "Wage Payment Motion") (D.I. 5), seeking authority to pay accrued prepetition wages that were unpaid as of the Petition Date and to continue paying employee benefits consistent with the Debtor's pre-petition practice and policies, among other things. This relief was necessary to the continuity of the Debtor's employee base. On October 15, 2010, the Court entered an order granting the Wage Payment Motion. (D.I. 35). Since this time, the Debtor has fully satisfied all of the scheduled pre-petition wage claims and post petition wages are current.

### B.    Agreement Regarding Use of Cash Collateral

Among its first day motions, the Debtor filed an Emergency Motion For Interim And Final Orders Authorizing Debtor's Post-Petition Use Of Cash Collateral. (D.I. 4). The Noteholder objected on several grounds, including alleging that it holds a post-petition lien on all of the Debtor's assets -- including food, beverage and service revenues -- and arguing that the Debtor was unable to provide it with adequate protection. (D.I. 16). The Debtor responded to these objections, contending, among other arguments, that post-petition revenues from its restaurant, bar, room service and other services were not subject to a post-petition lien by the Noteholder and could be used by the Debtor to pay the costs of its Chapter 11 case.

On November 3, 2010, the Debtor and the Noteholder filed an Agreed Motion For Conditional Use of Cash Collateral authorizing the Debtor to use cash collateral through November 15, 2010 (D.I. 52). The Court granted that motion on November 5, 2010 (D.I. 55). This authorization was further extended by an agreement between the Debtor and the Noteholder filed with the Court on November 23, 2010. (D.I. 87).

On December 22, 2010, the Noteholder and the Debtor filed a Final Agreed Order Authorizing The Debtor's Use Of Post-Petition Cash (the "Cash Use Order") (D.I. 112) by which the Debtor is, with some caveats, authorized to use the Noteholder's cash collateral through the later of (a) April 7, 2011, or Court decisions regarding approval of a disclosure statement and confirmation of a plan. Among other terms, the Debtor is required to make monthly payments to the Noteholder. The Court entered the Final Cash

Use Order on December 27, 2010 (D.I. 115) and the Debtor is in compliance with its terms.

C.    The Debtor's Retention of Counsel

Among its first day motions, the Debtor filed an Application to Employ Stoll Keenon Ogden PLLC as Counsel for Debtor (D.I. 7).  The Noteholder filed an objection on several grounds, including that Stoll Keenon Ogden PLLC's ("SKO" or "Debtor's Counsel") legal fees could not be paid with the Noteholder's cash collateral and that Debtor's Counsel lacked impartiality due to $15,000 in payments received for legal fees made during the ninety (90) days prior to the Petition Date.  (D.I. 18).  By order entered November 17, 2010, the Court approved SKO's employment but ordered it to disgorge the $15,000 received during the ninety (90) day period prior to the Petition Date and to waive any additional prepetition claims it held against the Debtor in order to resolve any potential issues relating to its disinterestedness.  (D.I. 49).  SKO continues to represent the Debtor in its court-approved capacity.

D.    Allowance of Sysco's Administrative Claim

On October 26, 2010, Sysco/Louisville Food Services Company ("Sysco"), an unsecured creditor and essential vendor, filed a Motion To Allow Administrative Claim (D.I. 46), seeking allowance of an administrative claim under section 503(b)(9) of the Bankruptcy Code for $65,234.32 of its unsecured claim on grounds that it held a reclamation claim for that amount for goods received by the Debtor within forty-five days of the Petition Date.  On November 30, 2010, the Debtor, the Noteholder and Sysco filed an agreed motion granting Sysco an administrative expense claim for $27,669.55, with the remainder of its claim as a general unsecured claim.  (D.I. 93).  The Court granted the agreed motion on December 1, 2010.  (D.I. 94).

E.    Negotiations for a Consensual Plan

In its continuous efforts to formulate a consensual plan acceptable to its creditors, the Debtor has communicated with numerous prospective lenders, buyers and investors concerning new investment, refinance or sale of the Debtor's business and property.  As a result of those efforts, the Debtor received two expressions of interest to refinance its business and property for $9 million.  While the Debtor is of the opinion that a $9 million refinancing would be very beneficial to  it, the Noteholder and the other creditors, given the still challenging hospitality market in the Louisville area, the Noteholder refused to consider  such a refinance.  The Debtor also received an offer to purchase the Hotel for $6.5 million.  As a result of the Noteholder's refusal to consider a $9 million refinance, the Debtor did not to pursue that possibility either.

Subsequent to those efforts, the Debtor proposed a plan to the Noteholder more in keeping with a traditional reorganization, which proposal the Noteholder also rejected. The Plan proposed with this Disclosure Statement is a true reorganization plan which pays the lender in full and pays substantially more to all creditors than would be paid on a liquidation.

## IV.  THE PLAN

The plan terms are set forth in the Plan, attached as Exhibit 1 and incorporated as if set forth in full here.

## V.  CONFIRMATION OF THE PLAN

### A.  Acceptance or Rejection of the Plan

1.  <u>Section 1129(a) Requirements</u>.  As a prerequisite to Confirmation, the Bankruptcy Court must conclude that the Plan meets the requirements set forth in Section 1129(a) of the Bankruptcy Code that are applicable in this bankruptcy.  The Debtor believes that the Plan meets those necessary requirements; however, there is no assurance that the Bankruptcy Court will reach the same conclusion.

2.  <u>Acceptance by an Impaired Class</u>.  An Impaired Class of Claims will have accepted the Plan if the requisite amount and number of Claims in that Impaired Class vote in favor of the Plan.  Holders of at least two-thirds of the total dollar amount of Allowed Claims in the Impaired Class that vote must have voted to approve the Plan.  Likewise, more than one-half of the total number of the Allowed Claims in the Class actually voting must vote to accept the Plan.  In either instance, a Holder of a Claim designated under section 1126(e) of the Bankruptcy Code is not counted.  Under the Plan, Classes 1, 2, 3,  4, and 6 are Impaired.

3.  <u>Nonconsensual Confirmation</u>.  Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan over the dissent of any Impaired Class if all of the requirements for consensual confirmation under Section 1129(a) of the Bankruptcy Code are met except for the requirement found in Section 1129(a)(8) of the Bankruptcy Code.  In the event that any Impaired Class of Claims votes to reject the Plan, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code or (b) amend the Plan.

### B.  Conditions Precedent to the Confirmation and Effective Date of the Plan

The occurrence of the Confirmation Date and Effective Date shall be subject to satisfaction of the conditions precedent set forth in Article VIII, Sections B and C of the Plan.

### C.  Waiver of Conditions Precedent

To the extent legally permissible, each of the conditions precedent in Article VIII Section B of the Plan and Article VIII Section C of the Plan may be waived, in whole or in part, by the Debtor in its sole discretion.  Any such waiver of a condition precedent may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action other than proceeding as if such condition did not exist.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights.  Upon the waiver of any conditions to the Effective Date set forth in

Article VIII Section C of the Plan, and subject to the satisfaction in full of each of the remaining conditions set forth in such Article, the Plan shall become effective in accordance with its terms without notice to third parties or any other formal action.

## VI. DEBTOR'S RECOMMENDATION

The Debtor believes that Confirmation of the Plan is in the best interest of all Creditors and parties in interest. Consummation of the Plan will allow Creditors the maximum possible recovery and is preferable to all other alternatives. Each Holder of a Claim in a voting Class should vote to accept the Plan in accordance with the Voting Procedures set forth below.

## VII. PLAN FEASIBILITY AND LIQUIDATION ANALYSIS

A.     Plan Feasibility For Reorganization

1.     In General

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court will not confirm a Chapter 11 plan if it is likely that the reorganized debtor will liquidate or need further financial reorganization. The Plan is a true reorganization plan since the Debtor will continue its present operations post-confirmation, retain its employees with competitive wages and benefits, and provide its lodging, conference and banquet services to the community. The Debtor's current management and ownership shall continue, and Mr. Papovich will continue as a salaried employee. The Hotel has from time to time employed Mr. Papovich's son and brother and may continue to do so.

Feasibility is often determined by estimates of projected gross profit and net profit. Through confirmation of the Plan, the Debtor will pay the full amount owed to the Noteholder over an extended term and amortization schedule. Due to the restructuring of the terms of the Debtor's loan with the Noteholder, the Debtor will have more flexibility with the Hotel's income stream in order to operate profitably and efficiently and to pay all payments required under the Plan.

2.     Estimated Post-Petition Income

In this section, the Debtor provides income projections that it believes are reasonable and consistent with its historical results. These projections have been prepared solely for the purpose of evaluating the Plan's feasibility based on the Debtor's past history and projected business operations. Based on this analysis, the Debtor believes it has the income-generating potential from the retained operation to make the secured and unsecured payments as due in the Plan.

The Debtor has several sources of income. The Debtor projects that its average monthly income post petition will be as follows:

$442,000          Income generated by hotel room rentals

| | |
|---|---|
| + $ 38,000 | Income generated by conference and banquet room rentals |
| + $140,000 | Income generated by food and beverage sales |
| + $ 2,500 | Other Income |

_____

**$ 622,500**       **Total monthly income (estimates only, individual monthly amounts may be higher or lower due to the cyclical nature of the Debtor's business)**

3. <u>Estimated Post Petition Expense</u>

The Debtor estimates its post-petition monthly expenses, not including amounts needed to fund payments under the Plan, will be as follows:

| | |
|---|---|
| $153,000 | Employee Wages |
| + $30,000 | Employee benefit contributions and related expenses |
| + $ 6,000 | Insurance |
| + $36,000 | Franchise fees |
| + $36,000 | Electricity, gas, phone and other utilities |
| + $10,000 | Advertising and Public Relations |
| + $25,000 | Property maintenance |
| + $10,000 | Property tax |
| + $ 1,200 | Other taxes |
| + $70,000 | State & Transient tax |
| + $25,000 | Legal/accounting |
| + $55,000 | Vendors for food, beverage, and related goods |
| + $ 9,000 | Miscellaneous (including software support) |
| + $30,000 | Room Costs |
| + $ 3,500 | Vehicles/Equipment |

+ $35,000         PIP

_____

**$534,700**        **Total monthly expenses excluding Plan payments (estimates only, individual monthly amounts may be higher or lower due to the cyclical nature of the Debtor's business)**

    4.    <u>Estimated Plan Obligations</u>

The Debtor estimates that its obligations under the Plan for items not already paid by the Effective Date will be as follows:

| Distributions | Months 1 through 6 | Months 7 through 43 | Months 44 through 210 | Month 211 |
|---|---|---|---|---|
| **Noteholder Interim Payments** | $270,000.00 | $0.00 | $0.00 | $0.00 |
| **Administrative Claims for Professional Fees[3]** | $75,000.00 | $0.00 | $0.00 | $0.00 |
| **Cure Payments for Assumed Executory Contracts and Leases** | $18,752.86 | $0.00 | $0.00 | $0.00 |
| **Sysco's Administrative Claim** | $27,669.55 | $0.00 | $0.00 | $0.00 |
| **Class 1: Noteholder's Secured Claim** | $0.00 | $2,507,672.88 | $11,563,158.28 | $10,346,467.96 |
| **Class 2: De Minimis Claims[4]** | $2,466.18 | $0.00 | $0.00 | $0.00 |
| **Class 3: General** | $0.00 | $119,253.99 | $0.00 | $0.00 |

_____

[3]     This amount presumes unapproved or unpaid SKO fees as of the Effective Date, in excess of escrow amounts.

[4]     The total amount of De Minimis Claims in Class 2 is $3,082.73. However, the Plan provides for payment of 80% of each Claim such that the total amount to be distributed to Holders of Class 2 Claims is $2,466.18.

| | | | | |
|---|---|---|---|---|
| **Unsecured Claims[5]** | | | | |
| **Class 4: Essential Vendor Claim[6]** | $0.00 | $24,921.86 | $0.00 | $0.00 |
| **Class 5: Advance Payment Claims** | $0.00 (satisfied through performance) | $0.00 | $0.00 | $0.00 |
| **Class 6: Priority Claims** | $4,972.60 | $0.00 | | $0.00 |
| **Total Monthly Payment:** | **$66,476.87** ($398,861.19 total divided by 6 months) | **$73,662.46** ($2,651,848.73 total divided by 36 months) | **$69,657.58** ($11,563,158.28 divided by 166 months) | **$10,346,467.96** (Lump Sum) |

B.    Liquidation Analysis

1.    Introduction

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accepts the plan or (b) receives property under the plan of a value, as of the effective date, that is not less than the value such holder would receive under Chapter 7 of the Bankruptcy Code on the Effective Date. To make this determination, the debtor typically estimates the recovery generated by liquidation in a Chapter 7 context. In a Chapter 7 proceeding, a trustee is appointed to liquidate the Debtor and reduce all of its assets to cash. The gross amount to distribute would include the cash held by the debtor at the time of the conversion to Chapter 7, proceeds from the sale of assets, and recovery of accounts receivable and Chapter 5 actions. This amount would be reduced by the costs and fees of liquidation, additional administrative expenses and priority claims.

2.    Qualifications and Warnings

Projecting recoveries in any Chapter 7 case is an uncertain process due to the number of unknown variables, including those beyond a Chapter 7 trustee's control. Therefore, projections contained in the liquidation analysis are truly estimates and the conclusions are speculative. Neither the Debtor nor its professionals make any representation about the accuracy of the projections should this case convert to a Chapter

---

[5]    The total amount of General Unsecured Claims in Class 3 is $477,015.96. However, the Plan provides for payment of 25% of each Claim such that the total amount to be distributed to Holders of Class 3 Claims is $119,253.99.

[6]    The total amount of the Unsecured Essential Vendor's Claim in Class 4 is $99,687.45. However, the Plan provides for payment of 25% of this Claim such that the total amount to be distributed to the Holder of this Claim is $24,921.86.

7 bankruptcy. The information contained in the liquidation analysis has not been reviewed or audited by independent accountants. Unanticipated events may occur and certain assumed events may not materialize. In the event that this case converts to a Chapter 7 liquidation, actual results may materially vary from the estimates set forth in the liquidation analysis.

     3.    Assumptions

For purposes of the liquidation analysis, the Debtor made many assumptions. The assumptions the Debtor considers to be the most significant are set forth below.

     (a)    Conversion: The Debtor's case is converted on May 1, 2011 (the "Conversion Date").

     (b)    Chapter 7 Trustee's Professionals: The Chapter 7 trustee would retain professionals (including attorneys) to assist in the liquidation and wind down of the Debtor's estate. It is further assumed that the professionals currently involved in this case will have Claims upon conversion, so new professionals will be retained.

     (c)    Cash in Chapter 7 Liquidation: Cash is projected as of the assumed conversion date and is not subject to a discount factor.

     (d)    Wind-Down Expenses: This category includes payment of the Debtors' employees' salaries for a one-month period and other costs while the Debtor's operations are wound down.

     (e)    Trustee's Fees and Commissions: The Debtor assumes that the Chapter 7 trustee will be entitled to be paid its statutory percentage fee for all of the litigation proceeds recovered and the proceeds realized from the sale of Debtor's assets.

     4.    Comparison

     (a)    Chapter 7

| | |
|---|---|
| Estimated Cash as of the Conversion Date | $ 90,000 |
| Estimated Real Property Value at liquidation | + $6,500,000[7] |

Hotel Room, Banquet Hall and Conference Room,

---

[7]    This is the amount of a postpetition offer to purchase the Hotel.

[8]    The value of furniture is based on a November, 2010 auction of hotel personal property located in a Marriott, valuing the contents of each hotel room, including armoire, headboard(s), 25" tvs, art (4 per room), mattress & boxspring set, bedframe, linens, desk, desk chair, dresser, nightstand(s), end table, lounge chair & ottoman, table lamp, desk lamp, nightstand lamp(s), floor lamp, coffee maker, and drapes at $250 per room. RW Louisville has 270 rooms, resulting in a furniture value of $67,500. The value of equipment is based on RW Louisville's most recent annual inventory, conducted in December, 2009, and

Furniture, Pool and Workout Facility Equipment, Office Equipment and other furnishings, depreciated

+ $212,357[8]

**Total Estimated Assets Subject to Lien of Noteholder**

= **$6,802,357**

| | |
|---|---|
| Noteholder's Claim | $15,212,599.39 |
| Application of liquidation value of Noteholder Collateral | – 6,802,357.00 |
| Noteholder deficiency (unsecured) claim | 8,410,242.39 |

Estimated Proceeds from all other Causes of Action including Avoidance Actions on which Noteholder has no lien (net of attorney fees and expenses of collecting same)

$100,000[9]

| | |
|---|---|
| Priority Claims (including Admin Claims) | – $107,642.15 |
| | ($7,642.15) |

Funds Available for Distribution to Creditors holding unsecured non priority claims (including Noteholder deficiency claim)

– $0 –

    (b)    <u>Chapter 11</u>

    As set forth above, on a liquidation, the Noteholder realizes only $6,802,357, priority creditors get approximately $100,000 and the non-priority unsecured creditors get nothing at all. Under the Plan, the Noteholder would be paid the full amount of its over $15 million secured claim -- the amount of which the Debtor believes is well in

---

includes computers, utensils, silver, china, maintenance tools and supplies, exercise room equipment, pool furniture, lobby furniture, and other items.

    [9]    Approximately $1 million in gross transfers were made by the Debtor during the preference periods. Four transferees -- the Franchisor ($183,453.74), Sysco ($161,284.75), the Kentucky State Treasurer ($98,673.25) and LG&E ($76,005.75) -- received transfers totaling more than half of this amount. However, the Debtor anticipates that these transferees will have significant ordinary course and new value defenses based on the timing of the transfers and the claims asserted by the transferees in this Bankruptcy Proceeding. Of the remaining 25 transferees, 15 received transfers totaling less than $15,000. As such, the Debtor anticipates that it would incur significant legal expense to prosecute these remaining actions. Accordingly, the Debtor values these actions at $100,000).

excess of the property's true value notwithstanding its treatment under the Plan -- plus interest of over $270,000 in additional adequate protection payments. The other creditors would be paid approximately $273,037.04 and customers who placed deposits for events will have those events proceed under the Plan.

## VIII.  VOTING PROCEDURES

A.    Notice

IN ACCORDANCE WITH THE BANKRUPTCY CODE, ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED BY THE BALLOTS OF THE CREDITORS HOLDING ALLOWED CLAIMS THAT ACTUALLY AND PROPERLY VOTE ON THE PLAN.  THEREFORE, IT IS IMPORTANT THAT THE CLAIMANTS EXERCISE THEIR RIGHT TO ACCEPT OR REJECT THE PLAN.

B.    General Voting Provisions and Information

1.    The Voting Agent.  The Voting Agent will collect the ballots by delivery to the Voting Agent at Stoll Keenon Ogden PLLC, Attn: Kent Durning, 2000 PNC Plaza, 500 West Jefferson Street, Louisville, Kentucky 40202.

2.    Entities Entitled to Vote.  This Disclosure Statement and the appropriate ballot(s) are distributed to all Holders of Allowed Claims and Holders of Claims that are contested, disputed, contingent and/or unliquidated who are allowed to vote pursuant to Federal Rule of Bankruptcy Procedure 3018 and have filed a timely motion to have their Claims temporarily allowed.  Only the Noteholder and those persons and Entities, holding Claims in Class 2, Class 3, Class 4, and Class 6, as reflected in the Plan, including its Exhibits A and  B  to the Plan, where applicable, are entitled to vote on the Plan.  Scheduled creditors whose Claims were not listed as disputed, contingent and/or unliquidated and who are not identified in Exhibits A and, B to the Plan, where applicable, will not be entitled to vote because their Claims have already been satisfied by the Debtor.  There is a separate ballot designated for each impaired voting Class in order to facilitate vote tabulation; however, all ballots are substantially similar in form and substance, and the term "ballot" is used without intended reference to the ballot of any specific Class of Claims.

3.    Classes Entitled to Vote.  Holders of Claims in an Impaired Class are permitted to vote.  Classes 1, 2, 3, 4 and 6 are Impaired and may vote for the Plan.

4.    Vote Required for Acceptance of the Plan.  A Class of Claims shall accept the Plan if it at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class have properly voted to accept the Plan.

5.    Disregarded Votes.  Pursuant to Section 1126(e) of the Bankruptcy Code, a vote on the Plan may be disregarded if the Bankruptcy Court determines that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

6. <u>Questions About Voting</u>. Any questions about the voting procedures or the solicitation packet may be directed to the Voting Agent in writing  at Stoll Keenon Ogden PLLC, Attn: Kent Durning, 2000 PNC Plaza, 500 West Jefferson Street, Louisville, Kentucky 40202.

C. <u>Voting Procedures</u>

1. <u>Voting Deadline</u>. This Disclosure Statement and the appropriate ballot(s) are distributed to all Holders of Claims that are entitled to vote on the Plan.

IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN _____, 2011 OR SUCH LATER DATE UPON WHICH THE DEBTOR AGREES (THE "VOTING DEADLINE").  ONLY THOSE BALLOTS ACTUALLY RECEIVED ON OR BEFORE  SUCH VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.

2. <u>Ballots</u>. All votes must be cast by properly submitting the duly completed and executed form of the ballot designed for such Class.  Copies of the proposed ballot for each Class that is entitled to vote to accept or reject the Plan are collectively attached at Exhibit 2.

ANY BALLOT RECEIVED WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE COUNTED AND WILL BE DEEMED TO BE CAST AS AN ACCEPTANCE OF THE PLAN.

ANY BALLOT RECEIVED THAT IS NOT SIGNED OR THAT CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT IS AN INVALID BALLOT AND WILL NOT BE COUNTED FOR PURPOSES OF DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN. ONLY BALLOTS WITH AN ORIGINAL SIGNATURE WILL BE ACCEPTED. BALLOTS WITH COPIED SIGNATURES WILL NOT BE ACCEPTED.

Ballots must be delivered to the Voting Agent, at its address set forth above, so as to be received by the Voting Deadline, set forth above.  In accordance with Federal Rule of Bankruptcy Procedure 3018(c), the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this Chapter 11 Case.  PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

3. <u>Change or Withdrawal of Vote</u>. A ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent.  After the Voting Deadline has passed, a vote may be withdrawn only with the approval of the Bankruptcy Court.

In order to be valid, a notice of withdrawal must: (a) specify the name of the Holder who submitted the ballot to be withdrawn; (b) contain a description of the Claim(s) to which it relates; and (c) be signed by the Holder in the same manner as on the

ballot.  The Debtor expressly reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan.

Any Holder of a Claim who has submitted a proper ballot to the Voting Agent may change its vote by submitting to the Voting Agent a subsequent proper ballot postmarked prior to the Voting Deadline.  In the event that more than one timely, properly-completed ballot is received with respect to the same Claim, the ballot that will be counted for voting purposes will be the ballot that the Voting Agent determines was the last to be timely received.

## IX.  EFFECT OF CONFIRMATION

### A.  Discharge of Claims and Termination of Interests

Except as provided in the Confirmation Order, pursuant to Section 1141(d) of the Bankruptcy Code, the rights afforded under the Plan and the treatment of Claims and respective Distributions under the Plan shall be in exchange for and in complete satisfaction, settlement, discharge and release of all Claims of any nature against each of the Debtor, its Estate, its successor, its property or the Debtor's Affiliates that occurred prior to the Effective Date (the "Discharge Date").  Confirmation shall be a judicial determination of discharge of the Debtor from all Claims and other debts that arose before the Discharge Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Claim based on such debt is allowed pursuant to Section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.  Such discharge shall void any judgment obtained against the Debtor at any time to the extent such judgment relates to a discharged Claim.

### B.  Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.. **THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN, EFFECTIVE AS OF THE DISCHARGE DATE, ALL PERSONS AND ENTITIES FROM ENFORCING OR ATTEMPTING TO ENFORCE ANY SUCH CONTRACTUAL, LEGAL AND EQUITABLE SUBORDINATION RIGHTS SATISFIED, COMPROMISED AND SETTLED IN THIS MANNER.**

### C.  Injunction

Except as otherwise expressly provided in the Plan, all persons and Entities that have held, hold or may hold Claims against the Debtor or the Debtor's Affiliates are permanently enjoined, from and after the Discharge Date, from taking any of the

following actions against any of the Debtor, the Debtor's Affiliates or its Estate, on account of any Claims or Causes of Action arising from events prior to the Discharge Date: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind; and (iv) asserting any defense or right of setoff, subrogation or recoupment of any kind against any obligation, debt or liability due to the Debtor or the Debtor's Affiliates.

By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving Distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth herein.

D.      Terms of Existing Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case pursuant to Sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Discharge Date.  The Confirmation Order will permanently enjoin the commencement or prosecution by any person or Entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan.

E.      Exculpation

None of the Debtor, its Estate, the Debtor's Affiliates or any of their respective present or former officers, directors, shareholders, members, employees, advisors, attorneys or agents acting in such capacity or their respective affiliates, shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or any other party in interest, or any of their respective agents, shareholders, members, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (a) any act taken or omitted to be taken on or after the Petition Date, (b) the Disclosure Statement, the Plan, and the documents necessary to effectuate the Plan and (c) the administration of the Plan and the Distribution of property under the Plan.

## X.  FEDERAL TAX CONSEQUENCES UPON CONSUMMATION OF THE PLAN

A.      Consequences to the Debtor

The Debtor and its advisors have determined that upon consummation of the Plan the following federal tax consequences are likely to occur.

1)  To the extent otherwise deductible expenses, such as interest and ordinary and necessary business expenses, are reduced by the Plan, cancellation of indebtedness attributable to such debt is not excepted to give rise to adverse or negative federal tax consequences.

2)   Discharge of other non-deductible debt generating cancellation of indebtedness is not expected to generate adverse or negative federal tax consequences due to the Chapter 11 case except to the extent the tax attributes of the Debtor are required to be reduced pursuant to federal tax law.

The Debtor and its advisors have determined that it is unlikely that there will be adverse or negative federal tax consequences to the Debtor upon consummation of the Plan.

B.      Consequences to the Holders of Claims

Any Holder of a Claim receiving a Distribution under the Plan may be subject to tax consequences.  The Internal Revenue Service and state taxing authorities may consider such Distributions to be taxable income.  The Debtor urges all Holders of Claims to consult with their own tax attorney and/or accountant.

C.      Disclaimer

The comments in this section are general warnings regarding potential tax treatment.  Neither the Debtor nor its professionals anticipate that any party will rely on statements contained in the Disclosure Statement, the Plan, or any other documents filed in this bankruptcy for tax purposes without first consulting a tax professional.  Each party is strongly recommended to confer with its own tax attorney and/or accountant regarding actual tax consequences stemming from its own particular circumstances.

## XI. CONCLUSION

The Debtor believes that Confirmation and Consummation of the Plan is in the best interest of the creditors and parties in interest.  However, the Debtor strongly suggests that all Holders of Allowed Claims study the Plan to independently determine its effect.  The Debtor encourages all Entities entitled to vote to properly and timely cast a ballot to accept the Plan.

(Remainder of page intentionally left blank)

Dated:  March 7, 2011

Respectfully submitted,

_____

Name:  James J. Papovich
Title:    General Manager, RW Louisville
           Hotel Associates, LLC