**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| IN RE: | BANKRUPTCY NO. 10-35356 |
| RW LOUISVILLE HOTEL ASSOCIATES, LLC | CHAPTER 11 |
| Debtor | |

**JOINT OBJECTION OF ORIX CAPITAL MARKETS, LCC AND WELLS FARGO BANK, NATIONAL ASSOCIATION, FORMERLY KNOWN AS WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF DLJ COMMERCIAL MORTGAGE CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1998-CF2 TO FOURTH AMENDED PLAN OF REORGANIZATION**

Respectfully submitted,

*/s/ Brian H. Meldrum*
Brian H. Meldrum
D. Cooper Robertson
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400
Facsimile: (502) 779-8296
COUNSEL FOR NOTEHOLDER

Wells Fargo Bank, National Association, formerly known as Wells Fargo Bank Minnesota, National Association, successor by merger to Norwest Bank Minnesota, National Association, as trustee for the registered holders of DLJ Commercial Mortgage Corp., Commercial Mortgage Pass-Through Certificates, Series 1998-CF2 (the "Noteholder"), acting by and through ORIX Capital Markets, LLC, solely in its capacity as special servicer, and ORIX Capital Markets, LLC ("ORIX") as assignee of certain unsecured claims in this proceeding,[1] hereby file their Joint Objection to the Debtor's Fourth Amended Plan or Reorganization.[2] In support of this Objection, Noteholder and ORIX state as follows:

**INTRODUCTION**

The changes introduced in the Debtor's Fourth Amended Plan have either worsened, or failed to cure, the problems with its Third Amended Plan. For the reasons set forth in Noteholder's Objection to the Third Amended Plan (Dkt. No. 312), and for the reasons set forth below, the Court should deny confirmation and grant the Noteholder's motion for relief from the automatic stay (Dkt. No. 169).

*First*, the Debtor has worsened its gerrymandering problem in a futile attempt to manufacture an impaired accepting class under Section 1129(a)(10). The only impaired class that the Debtor had carried in the solicitation of its Third Amended Plan was Class 4 – Sysco,

---

[1] ORIX is assignee of the following claims: Class 2: Culligan Water Conditioning (Dkt. No. 242); Ely Services (Dkt. No. 213); Helium Express (Dkt. No. 214); Michael White (Dkt. No. 218); National Quartet (Dkt. No. 219); Shaheens (Dkt. No. 215); Thoroughbred Soccer (Dkt. No. 216); Triton Imaging System (Dkt. No. 220); United Soccer (Dkt. No. 221); Willis Klein (Dkt. No. 217). Class 3: American Printing House (Dkt. No. 241); Belmar Flower Shop, Inc. (Dkt. No. 251); Crystal Enterprises (Dkt. No. 268); DECA (Dkt. No. 278); Filter Brite (Dkt. No. 277); Kaufman Carpet Cleaning (Dkt. No. 278); Klosterman Baking Co. (Dkt. No. 262); Littlefield Fire & Safety Equipment (Dkt. No. 226); Louisville Magazine (Dkt. No. 265); McClarty & Associates, Inc. (Dkt. No. 266); MPC Promotions (Dkt. No. 227); O'Dell Equipment & Supply (Dkt. No. 243); Robbins Heating & Air (Dkt. No. 245); Securitas Services (Dkt. No. 281); Warren Technology, Inc. (Dkt. No. 253). Class 6: Metro Housing, Inc. (Dkt. No. 212); Site Search, LLC (Dkt. No. 211) (collectively, the "Assigned Claims").

[2] Noteholder and ORIX previously filed their Joint Objection to the Debtor's Third Amended Plan of Reorganization (Dkt. No. 312) (the "Original Objection"), as well as their Joint Objection to Debtor's Term Sheet for Fourth Amended Plan (Dkt. No. 351) (the "Term Sheet Objection"), and hereby incorporate those filings and exhibits thereto as if fully stated herein. This Objection is intended to address only the aspects of the Fourth Amended Plan that differ from the Third Amended Plan. For ease of reference, Noteholder and ORIX attach hereto as Exhibit A a Summary of Objections.

which was obviously gerrymandered to reach that result. Instead of including Sysco's otherwise indistinguishable trade credit claim with the other trade creditors, the Debtor's Fourth Amended Plan has made the situation worse. It now makes two additional arbitrary distinctions, attempting to divide pre- and post-petition trade creditors, and then further separating trade claims that were purchased by ORIX from those that were not purchased by ORIX. These distinctions have no business purpose other than to separate plan opponents from plan supporters in order to manufacture an impaired accepting class, which the Debtor otherwise lacks.

*Second*, the Debtor's Plan still violates the absolute priority rule. The only change from the Third Amended Plan and the Fourth Amended Plan was that Mr. Papovich apparently will now guaranty some, but not all, of the unsecured debt. However, he does not propose to contribute any new capital. A guaranty does not count as "money or money's worth" under the new value exception to the absolute priority rule, and in any event, there has been no market test such as an equity auction, which is required to invoke that exception.

*Third*, the Debtor's Plan is still not feasible. Mr. Papovich has now agreed to waive the management fee he was budgeting for himself, but that alone does not free up sufficient cash flow even to service the debt to the Noteholder the first year, let alone other case constituents. The Debtor's projections, after adding back the management fee, predict net income of $1,100,903.00. However, payments to the Noteholder under the Fourth Plan consume $1,094,334.36 of that amount, leaving only $6,568.64 to pay trade claims and administrative claims. Moreover, the Debtor will have no ability to satisfy the $13 million balloon payment that will be due at the conclusion of the Plan term.

*Fourth*, the Debtor's Fourth Amended Plan is not fair and equitable, and seeks to persuade the Court to re-visit its plan interest rate ruling of 6.75%, proposing instead a rate of

5.5% based on a 10-year reduction in term. At most, a 10-year reduction in term is worth only a 90 basis point change in the Court's interest rate ruling. Additionally, the Debtor has retained the six-month "interest rate holiday" feature of its plan that drives the effective interest rate down to less than 5.2%.

*Fifth*, Mr. Papovich's decision to personally guaranty only certain of the Debtor's unsecured debt (i.e., trade claims) but not other unsecured debt (i.e., Noteholder's Deficiency Claim) discriminates unfairly against the Noteholder.

I. **WITHOUT IMPROPER GERRYMANDERING, THE DEBTOR LACKS AN IMPAIRED ACCEPTING CLASS.**

Unless it somehow manages to separately classify the 45% of trade claims that have rejected the Plan from those that have accepted it, the Debtor has no impaired accepting class under Section 1129(a)(10). Unsecured claims should "generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor." *In re 226 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992)(quotation omitted). The rule – referred to by the Fifth Circuit Court of Appeals as the "one clear rule" – is simple: "Thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991). Although courts recognize that there are certain instances in which claims of equal ilk may be separated, the Sixth Circuit instructs that "[t]here must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote

3

for the plan and placing them in their own class." *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986).[3]

### A. The Debtor May Not, *Post Facto*, Separate Pre- and Post-Petition Vendors.

The Post-Petition Vendor claims in Class 4 enjoy the exact same priority as the general unsecured claims in Class 3. There is no reason for their separate classification other than to conjure an impaired accepting class. Under *U.S. Truck*, the Post-Petition Vendors may not be classified separately unless they have a unique "non-creditor" interest in the Debtor's business that sets them apart from other trade creditors. There is no such "non-creditor" interest at issue here. The Debtor's proposed distinction is a fiction, created to separate plan supporters from plan opponents. Worse still, the Debtor has attempted to redefine prior-Class 3 after it has already tabulated the votes. *See e.g.*, *In re Mid-State Raceway, Inc.*, 343 B.R. 21 (Bankr. N.D.N.Y. 2006) (post-voting reclassification scheme not permitted and characterized as "gamesmanship . . . which arguably could go on indefinitely").

The burden to justify the segregation of similar creditors in the Sixth Circuit is heavy. For example, in *Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc. (In re Bustop Shelters of Louisville, Inc.)*, 914 F.2d 810 (6th Cir. 1990), the Sixth Circuit Court of Appeals affirmed a

---

[3] *See also*, *In re Boston Road Ltd. P'Ship*, 21 F.3d 477, 482 (2d Cir. 1994) ("overwhelming weight of judicial authority" holds that similar claims may not be separately classified to engineer an impaired assenting class); *In re Bryson Properties, XVIII*, 961 F.2d 496, 502 (4th Cir. 1992) (no basis for separate treatment of deficiency claim and other unsecured claims except to manipulate voting); *In re Lumber Exchange Building, L.P.*, 968 F.2d 647, 649-50 (8th Cir. 1992) (separately classifying deficiency claim from other unsecured claims was "thinly-veiled attempt to manipulate the vote"); *John Hancock Mutual Life Ins. Co v. Route 37 Business Park Assocs.*, 987 F.2d 154 (3rd Cir. 1993) (same); *In re Barakat*, 99 F.3d 1520 (9th Cir. 1996) (same); *In re Griswold Bldg., LLC*, 420 B.R. 666, 707 (Bankr. E.D. Mich. 2009) ("The proponent of the plan must demonstrate a justification for its classification scheme and that the classification scheme is not motivated by a purpose of gerrymandering an affirmative vote of an impaired class. To warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof.") (citations and quotations omitted); *In re Gibbs*, 230 B.R. 471, 474 (Bankr. D. Conn. 1999) (plan proponent must articulate an economic reason for separately classifying substantially similar claims); *In re D & W Realty*, 165 B.R. 127, 130 (S.D.N.Y. 1994) ("separate classification of unsecured deficiency claims and other unsecured claims . . . may be permitted only for legitimate business or Code-based reasons"); *In re Cantonwood Assoc's. Ltd. P'Ship*, 138 B.R. 648 (Bankr. D. Mass. 1992) (following *Greystone*); *Piedmont Associates v. Cigna Property & Casualty Insurance Co.*, 132 B.R. 75 (N.D. Ga. 1991) (no business justification for separate classification of unsecured claims).

bankruptcy court's rejection of such gerrymandering. There, the segregated creditor held a judgment against the debtor that was the subject of ongoing litigation, had received preferential transfers pre-petition, and had attached certain of the debtor's funds. *Id*. at 813. More significantly, any payments that the creditor was to receive under the plan were required to be escrowed pending final resolution of its claims due to the ongoing litigation. *Id*. Applying *U.S. Truck*, the appellate court noted that adversary proceedings are commonplace, and that the creditor's involvement in litigation with the debtor did not provide that creditor with a stake in the debtor's reorganization that was any different than any other creditor. *Id*. at 814. The court also did not view the escrow requirement in the plan or the prior attachment of the debtor's funds as a sufficient basis for separate classification. *Id*. at 814. Therefore, separate classification was not warranted. The question here is even easier to answer. Trade creditors with an expectation of continuing to do business with a reorganizing debtor are exceedingly commonplace, and the Post-petition Vendors do not have a unique stake in this Debtor's reorganization that justifies their separate classification.[4] The Post-petition Vendor Claims in Class 4 must be included in Class 3.

### B. The Debtor May Not Separately Classify Purchased Claims From Non-Purchased Claims.

Compounding its gerrymandering problem, the Fourth Amended Plan introduces yet another way to carve up the otherwise indistinguishable trade claims: if ORIX purchased a claim, it is now separately classified from claims that ORIX did not purchase. There is no authority for such a distinction, and there is no "unique non-creditor interest" to support the separate classification. Of course, whether ORIX purchased a trade claim is merely a proxy for

---

[4] For instance, the Debtor continues to conduct business with numerous Class 3 trade creditors. A non-exhaustive list of the Class 3 creditors that the Debtor paid in May 2011 for post-petition services includes: American Hotel Register, Securitas Services, A Taste of Kentucky, Courier Journal, and O'Dell Equipment. *Compare* Fourth Am. Plan Ex. B *with* Debtor's Monthly Operating Report May 31, 2011, at Cash Disbursement Detail (Dkt. No. 298)

how the claim was voted.  In addition to the gerrymandering objections above, permitting a Debtor to reclassify its claims after-the-fact based purely on whether they were assigned or not would create bad policy.  It would wreak havoc with the expectations of purchasers of distressed debt in the marketplace if those claims could, after-the-fact, be partitioned out from similar creditors and treated differently based solely on whether the claim was assigned.  Moreover, in this particular case, the Debtor's efforts to nullify the votes cast by ORIX by segregating them into another class is an obvious attempt by the Debtor to effectively designate those votes without satisfying its burden under Section 1126(e).  As noted in the Original Objection, there is no basis to designate these votes.  *See* Original Objection, Dkt. 312, at 18-20.

Presumably, this attempt at isolating ORIX's purchased claims is premised on the statement in the Debtor's Term Sheet for Fourth Amended Plan (Dkt. No. 350) (the "Term Sheet") that the claims purchased by ORIX may be separately classified because "Sixth Circuit precedent permits separate classification of claims held by entities that have an interest distinct from other creditors of similar priority." (Term Sheet at 3).  However, opposition to a plan is not an acceptable basis on which to separately classify claims.  *See In re Suncruz Casinos, LLC*, 298 B.R. 833, 838 (Bankr. S.D. Fla. 2003) (rejecting 1111(b) right and lender's intent to vote against plan as sufficient bases for separate classification of deficiency claim).

In *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202 (Bankr. W.D. Tex. 2008), the Debtor sought to both designate the vote of, and separately classify, a creditor with whom the Debtor had been involved in extensive litigation.  *Id*. 208.  It was not disputed that the creditor wanted to end the litigation and that it would benefit if the Debtor ceased to exist.  *Id*. at 237.  The vote designation and classification arguments advanced by the Debtor were intertwined, and boiled down to the Debtor's assertion that the creditor wanted to put the debtor out of business.

6

*Id*. at 230. The court rejected this argument, first holding that bad-faith vote designation was not warranted because the creditor was merely protecting its own economic interests, and that a desire to end litigation is not the sort of "non-creditor" interest that would justify designation. *Id*. at 231-232. The court recognized that, under the circumstances, the creditor's actions in opposing the plan were simply defensive of its own interests. *Id*. at 232. Likewise, with respect to classification, the court found that the creditor's desire to end litigation was in fact an "integral part of its 'creditor interest.'" *Id*. at 238. *Save Our Springs* emphasizes that "each creditor is expected to cast his vote 'in accordance with his perception of his own self interest.'" *Id*. at 231 (internal citations and omissions omitted). Any classification scheme premised on Noteholder's or ORIX's plan opposition is flawed. If this scheme were permissible, the prohibition on gerrymandering would be illusory, and the Debtor could effectively achieve vote designation without satisfying its burden under section 1126. Accordingly, ORIX's purchased claims must be included with the other trade claims, irrespective of whether they were assigned.

### C. Absent Improper Gerrymandering, the Debtor Lacks an Impaired Accepting Class.

Section 1129(a)(10) requires that at least one impaired class vote in favor of a debtor's plan if another class has voted to reject the plan. 11 U.S.C. § 1129(a)(10). Here, the only impaired classes that have "voted" for the Plan – Class 2[5], Class 3, and Class 4 – cannot be counted as such because they are improperly classified. Thus, there is no impaired accepting class. This is clear from the Debtor's Report of Balloting. (Dkt. No. 286). As the report shows, Class 1, Class 7, Class 8, and Class 9 voted outright to reject the Plan. Class 2, the de minimis claims, had accepting votes totaling $1,017.82 and rejecting votes totaling $1,787.57, and therefore the Debtor failed to obtain the required two-thirds in amount of the total votes cast. 11

---

[5] When ORIX's *De Minimis* claims are properly included in Class 2, Class 2 rejects the Plan.

7

U.S.C. § 1126(c). If the Court ignores the Debtor's *post hoc* efforts to fracture the trade claims based on whether the debtor conducts business with the vendor post-petition, or whether the claim was assigned to ORIX, and mandates a "general unsecured" class consisting of all unsecured trade claims, the Debtor does not carry that class. There are $320,927.77 in timely, non-insider trade claims which cast votes on this plan, and over 45% of those dollars -- $146,371.10 have voted to reject it. The Debtor has far less "accepts" than the two-third in amount required. *See* Noteholder Demonstrative Ex. 6.

II. <u>**THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE**</u>

The Noteholder and ORIX have previously briefed their objections regarding the absolute priority rule as presented in the Debtor's Third Amended Plan and its Term Sheet, and the Noteholder and ORIX incorporate those objections by reference here. (Plan Obj., Dkt. No. 312; Term Sheet Obj., Dkt. No. 351). As with all prior plan iterations, the equity interests in the Debtor are unimpaired under the Fourth Amended Plan. Because there are numerous non-consenting classes of unsecured creditors, the Fourth Amended Plan cannot be confirmed unless those non-consenting classes are paid in full as of the effective date. *See* 11 U.S.C. § 1129(b)(2)(B).[6]

Instead of abiding by the absolute priority rule, the Debtor proposes a series of mechanisms designed to circumvent it. Specifically, the Fourth Amended Plan would finance the claims of any non-consenting creditor over the 7-year plan term at 5.5% interest. The Debtor contends that this counts as "payment in full." Next, with respect to certain categories of

---

[6] Without waiving its objections to the Debtor's classification scheme, the following classes have voted to reject the Fourth Amended Plan: Class 7 (Noteholder Deficiency Claim), Class 8 (ORIX Non-priority Purchased Claims), and Class 9 (ORIX Priority Purchased Claims). If all of the *De Minimis* claims were classified together, as they must be, that class would have voted to reject the Fourth Amended Plan. If all of the unsecured claims were classified together, as they must be, that class would have voted to reject the Fourth Amended Plan. If there were only two classes of unsecured claims – one consisting of all trade debt and one consisting of the Noteholder Deficiency Claim -- both of those classes would have voted to reject the Fourth Amended Plan, as set forth above.

8

unsecured claims, the Debtor's principal, Mr. Papovich, proposes to personally guaranty payment. Presumably the Debtor contends that would satisfy the new value exception to the absolute priority rule. However, neither of these things satisfies the absolute priority rule or any recognized exception to it.

> A. **The Debtors Have No Evidence That Financing Non-Accepting Unsecured Claims is the Economic Equivalent of Full Payment on the Effective Date.**

The Debtor bears the burden to prove that its Plan satisfies the absolute priority rule. *See, e.g., In re Perez*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) (debtor-in-possession has "particularly heavy burden" to demonstrate compliance with Code requirements); *In re Trails End Lodge, Inc.* 54 B.R. 898, 903 (Bankr. Vt. 1985); *In re Trevarrow Lanes*, 183 B.R. 475, 479 (Bankr. E.D. Mich. 1995). There is no evidence that the Debtor's unsecured promise to pay over 7 years at 5.5% is the economic equivalent of paying those claims in full, in cash, on the effective date. The only evidence adduced concerning the risk of any unsecured loan by this Debtor was the testimony of Mr. Ferrell, who opined that the appropriate discount rate would exceed 20%. The Debtor has not identified any expert witness competent to value or appraise the debt securities that the Plan would provide to non-accepting creditors. Without such evidence, the Debtor cannot possibly discharge its burden to prove that these "hope certificates" are as valuable as full payment on the effective date.

> B. **Mr. Papovich's Guaranty Does Not Satisfy the New Value Exception to the Absolute Priority Rule.**

Mr. Papovich still does not propose to contribute any new capital in exchange for his continued ownership of all of the equity of the Debtor. Mr. Papovich's proposed guaranty of certain unsecured claims does not cure the Fourth Amended Plan's patent violation of the Absolute Priority Rule. There is no such thing, for instance, as a "guaranty exception" to the absolute priority rule. Moreover, a personal guaranty does not satisfy the limited "new value"

9

exception to the absolute priority rule, because among other things, a guaranty of the emerging entity's debt is not "money or money's worth." *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1362 (7th Cir. 1990). *Kham & Nate's* reversed the bankruptcy court's determination that a personal guaranty by the debtor's principals satisfied the new value exception to the absolute priority rule. In so ruling, the Seventh Circuit noted:

> Guarantees are no different [than the promise of future labor]. They are intangible, inalienable, and unenforceable by the firm. [Guarantors] may revoke their guarantees or render them valueless by disposing of their assets; although a lender may be able to protest the revocation, the debtor cannot compel the guarantor to maintain the pledge in force. Guarantees have 'no place in the asset' column of a balance sheet. We do not know whether these guarantees have the slightest value, for the record does not reveal whether [guarantors] have substantial unencumbered assets that the guarantees would put at risk.
>
> *Ahlers* holds that *detriment* to the shareholder does not amount to 'value' to the firm; there must be an infusion of new capital. . . . A guarantee may be costly to the guarantor, but it is not a balance-sheet asset, and it therefore may not be treated as new value

*Id.* (internal citations omitted); *see also In re H.H. Distributions, L.P.,* 400 B.R. 44, 52 (Bankr. E.D. Pa. 2009) ("the guarantees are not money's worth"); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 717 (Bankr. M.D. Tenn. 1992) (new value must "be freely tradeable in the market by the debtor; and it must be an asset in the accounting sense"). Accordingly, because Mr. Papovich's guaranty does not constitute "money or money's worth," the Plan still violates the absolute priority rule.[7]

---

[7] Even if the guaranty did constitute new value, the Debtor must prove that the principal's contribution is both substantial and necessary to an effective reorganization. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 588 (6th Cir. 1986). The Noteholder submits that guaranteeing less than $300,000 in trade debt is not substantial when compared with the stipulated value of the Hotel of $11.2 million. The sum to be guaranteed represents less than 3% of the stipulated value of the Debtor's principal asset. Moreover, there is no evidence that Mr. Papovich's guaranty is necessary for the Debtor's operational or business success – this is clear from the fact that his guaranty proposal did not appear until the *fourth* amended plan. If his guaranty was genuinely critical to the Debtor's success, and not merely a litigation tactic to attempt to circumvent the absolute priority rule, it would have appeared earlier than August 29, 2011.

Even if the Court concludes that a personal guaranty is "new value," the Fourth Amended Plan cannot be confirmed absent a market test such as an equity auction. In *Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street P'Ship*, 526 U.S. 434, 454-57 (1999), the Supreme Court held that new value plans cannot be confirmed without exposing the proposed new value to a "market test" such as an equity auction. Here, the adequacy of the proposed new value has not been tested in the market, and the Debtor's plan does not propose an equity auction. *See id.* at 457 ("plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)").

## III. THE PLAN IS NOT FEASIBLE

The Noteholder has previously briefed why the Debtor's earlier Plans were not feasible, including that the (i) Debtor's projections are unduly optimistic and do not comport with its actual historical performance, including its post-petition performance; (ii) the Debtor has no unencumbered funds with which to pay inferior claims; (iii) the Debtor has no exit strategy from the looming, unfunded balloon payment that will be due at the end of the term. The Noteholder incorporates that briefing by reference herein. S*ee* Plan Obj., Dkt. No. 312; Term Sheet Obj., Dkt. No. 351). The Fourth Amended Plan is not feasible for those same reasons, and the following additional commentary is warranted.

The Fourth Amended Plan, if confirmed at 5.5%, will obligate the Debtor to pay to the Noteholder $91,194.53 every month for seven years. That constitutes annual payments to the Noteholder – solely on account of the Secured Claim and the Deficiency Claim – of $1,094,334.36. Even under the Debtor's unduly optimistic projections, this is impossible, because it projects having only $1,025,903 in net income during the first plan year. *See* RW Ex. 8. That is, the Debtor's own overly-optimistic projections *predict a default within the first year*

*of the Plan*. This is the opposite of feasibility This does not even take into consideration the other payment obligations the Debtor is undertaking – to administrative claimants, to trade creditors, etc. Even if one adds back the Debtor's Year 1 $75,000.00 management fee, which it purports to subordinate in the Fourth Amended Plan, that brings projected first-year net income up to only $1,100,903.00. Of that amount, at least $1,094,334.36 will have to be paid to Noteholder on account of the Secured Claim and the Deficiency Claim, which leaves only $6,568.64. That is, if everything goes right and the Debtor has nailed its projections[8] AND waives its management fee, it will have a mere $6,568.64 to pay other case constituents. This is not realistic, and there is simply insufficient net income to cash-flow the plan.

Moreover, if the Plan is confirmed, the Debtor will have a balloon payment due in seven years of $12,987,271.00. The stipulated value of the hotel is $11.2 million. The Plan does not explain what the Debtor will do to satisfy that liability in the unlikely event it gets to the maturity date, but testimony at the interest rate hearing indicates that the Debtor hopes to sell or refinance. Where a plan relies "on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date," such plans are "inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan." *See In re Smitty Investment Group, LLC*, 2008 Bankr. LEXIS 1542, *24 (Bankr. Idaho May 16, 2008) (internal quotation omitted). Here, even mild scrutiny reveals that the Debtor is simply gambling with Noteholder's money that the value of the hotel will greatly appreciate. However, there is no competent evidence about the likelihood of this occurring. The Debtor has no

---

[8] There are many reasons to be skeptical of the Debtor's projections. The Debtor missed its 2010 total revenue budget by nearly 11%, and missed its 2009 total revenue budget by 20%. *See* Obj. to Third Am. Plan at 23. Moreover, the Debtor is performing well below its 2011 net income projections. Through June 2011, the Debtor had actual net income of $531,984 against a budget of $678,354 (a 21.5% shortfall). *See* RW Ex. 27. Through July 2011, the Debtor had actual net income of $556,959 against a budget of $756,224 (a 26.3% shortfall). *See* July 2011 Income Statement, attached as <u>Exhibit B</u>..

evidence about what the value of the Hotel will be seven years from now. The Debtor's appraiser Mr. Bell testified that he did not perform a prospective valuation of the Hotel, and that if he were requested to do so, he would not accept the assignment. With no such evidence, the Debtor's ability to exit the Plan is speculative and does not satisfy the feasibility test. *See id.* at *45 (testimony of debtor's experts regarding future real estate market changes not reliable, so insufficient evidence to support feasibility finding).

## IV. THE PLAN IS NOT FAIR AND EQUITABLE

The Plan can not be crammed down over the Noteholder's objection unless the proposed treatment of Noteholder's secured claim is "fair and equitable." *See* 11 U.S.C. § 1129(b)(1). The Noteholder and ORIX have previously briefed their objections regarding the fair and equitable requirement as presented in the Debtor's Third Amended Plan and its Term Sheet, and the Noteholder incorporates those objections by reference here. (Plan Obj., Dkt. No. 312; Term Sheet Obj., Dkt. No. 351). On July 11, 2011, the Court issued its Order Setting Interest Rates, establishing a discount rate of 6.75% for Noteholder's Secured Claim and Deficiency Claim. (Dkt. No. 321.) However, certain features of the Fourth Amended Plan deserve attention here as well.

*First*, the Debtor's proposed interest rate of 5.5% is too low. The Fourth Amended Plan seeks a reduction of the Court-established 6.75% based on a proposed term reduction of 10 years. Assuming, without conceding, that 6.75% is the appropriate starting point for a 17-year term, a reduction of 10 years of term is worth, at most, a 90 basis point reduction. Such is the difference between the yield on an interpolated 17-year treasury (representing the term in the Third Amended Plan) and the yield on an interpolated 7-year treasury (representing the term in the Fourth Amended Plan). Mr. Ferrell will offer testimony to this effect at the confirmation

13

hearing. Accordingly, the interest rate attributable to the Noteholder's claims should be no lower than 5.85%.

*Second*, the Fourth Amended Plan still retains the "interest rate holiday" feature that has been extensively briefed and discussed. *See* Fourth Am. Plan at § III.A.B.1(b) ("interest shall begin accruing . . . beginning on the first day of the seventh (7th) calendar month following the Effective Date"). There is no basis or justification for this provision, and including it reduces the actual effective rate applied to the claims. While the Plan *says* it pays the Noteholder's claims 5.5%, it actually does not, because that stated rate does not even apply for the first 6 months. The effective rate is actually 5.16%, which is far lower than the Court-imposed rate, and far lower than the proper rate under the circumstances. This violates Section 1129(b)(2)(A), because it deprives the Noteholder of payments with a present value equal to the allowed amount of its claims.

V. **THE PLAN DISCRIMINATES UNFAIRLY AGAINST NOTEHOLDER.**

As noted above, the Plan provides that the Debtor's principal, Jim Papovich, will personally guarantee the claims held by those in Class 2, Class 3, Class 4, Class 6, and Class 8. Noteholder's deficiency claim, in Class 7, would not be guaranteed by Mr. Papovich. This treatment unfairly discriminates against Noteholder because its Class 7 claim is identically ranked as those in Class 2, Class 3, and Class 4. This different treatment provides the holders of the claims in Classes 2, 3, and 4 with a greater chance of recovery on their claims and increases the risk that Noteholder's deficiency claim will go unpaid when the Debtor and Mr. Papovich are forced to decide where to allocate funds during lean times. Because Noteholder does not consent to the treatment, and the treatment is so radically different, the law presumes unfair

discrimination under these facts. *See In re Dow Corning Corp.*, 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999).

WHEREFORE, Noteholder respectfully requests that the Court deny confirmation of the Debtor's Fourth Amended Plan, grant Noteholder's Motion to Terminate the Automatic Stay and for Abandonment of Property (Dkt. No. 169), and grant Noteholder and ORIX such further relief as the Court deems equitable and just. A proposed order is tendered.

Respectfully submitted,

/s/ *Brian H. Meldrum*
Brian H. Meldrum
D. Cooper Robertson
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400
Facsimile: (502) 779-8296
COUNSEL FOR NOTEHOLDER
AND ORIX CAPITAL MARKETS, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Objection was served on this 20th day of September, 2011 either via the ECF System, which will send an electronic notice of filing to counsel of record and all parties having filed a request for notice.

/s/ *Brian H. Meldrum*
Brian H. Meldrum

849691:3:LOUISVILLE